Our second case this morning will involve no change of counsel. Mr. Kola, case number 17-2040, Doe v. Nielsen. Good morning again, your honors. May it please the fourth counsel. We're again with the EB-5 program, our favorite program for today. Again, the factual background with regard to the EB-5 program, it's in essence you invest a certain dollar amount into the United States, you obtain a green card. In this particular fact, the plaintiff invested $500,000 in a company. That company loaned the money to the job creation entity, which is called EMC. Then on May of 2010, the plaintiff filed for a basically in essence a green card under the EB-5 program. In June of 2011, this application was approved. Then August of 2011, there were some transactions conducted in the real estate and purchase of property by EMC, the job creation entity. I will discuss that a little bit more in detail because I think that's kind of where the issue in this case kind of lies. In October, the adjustment of status was approved based on the person who obtained his green card. In September, two years afterwards, he applied for his permanent green card. When you get a green card under the EB-5 program, it's a two-year conditional green card. In essence, you have a green card for two years. After two years, you have to show three things by preponderance of evidence. Those three things are one, you put the money at risk. Two, that the investment was for at least two years. And three, you had the job creation requirements. Once he went through that process, the government denied his application to adjust status. In essence, denied him the right to get his permanent green card. In that denial, they're saying he never actually put his money at risk. And this is where we have a dispute with what transpired in this case and what's the facts of this case. The government, in its denial, focuses heavily on this at risk. And they couch it in the term of the land deal. But all that's required is that the plaintiff put a certain dollar amount into risk. Before we get into the merits, jurisdiction is secure here because? Because this is not a discretionary denial, it's a mandatory. The USCIS shall remove the condition once all the prerequisites are met. If the petitioner carries his burden of proof. Correct. So it's not a discretionary. I believe the government can seize their jurisdiction in this particular case. Right, we still have to address it. I understand. With regard to the money at risk, I don't think anybody can deny, the government can't deny that the plaintiff did not put the $500,000 into EMC, which is the job creation entity. It's been there, it's always been there. The question was to what end? Was it to the job creating entity? And was it sustained throughout the project? And the record here reflects the agency's concerns that this was a sham. That's the agency's concern, but there's no basis for that. What is the basis for that? Because the issue revolves around this land transaction. The flipped land transaction on the same day with almost 100% appreciation. Whatever the appreciation value was, if it's 56% or 100%, the question is, I understand your question, I understand, but it's irrelevant. Almost double in transactional price. But it's irrelevant. Because I'll tell you why it's irrelevant. On the same day. He has some mysterious intermediary that the agency didn't know enough about because the submission was incomplete. But your honor, here's the point. The point is, this entity went and bought a piece of land. How that entity bought the land, acquired the land, and what dollar amount the entity required, is irrelevant. There's no requirement that we go beyond that transaction. What was being asked by USCIS of our client is to go in, now we have to determine, was it a fair deal? Was the property acquired properly? Was there some kind of alternative motive for the original seller selling to the secondary seller? There's no requirement in the statute anywhere that requires that. Did all of his money go to part of the purchase? Again, with the issue of these EB-5s, there's multiple investors, but it's deemed that his money went towards that purchase. I don't know. Again, we've got 24 people. I understand. Half a million each. That's kind of the quirk of how EB-5s work, is you assume that each individual person's money properly went where it went. Do all of them have to have the same risk? For EB-5s in general? Yes. In this particular case, with regards to the land transaction, we're being asked to prove something that under no other consideration you'd be asked to prove. You have a land deal. It's bought. Land is bought at a lower price, generally sold at a more expensive price. The fact that it occurs on the same day shouldn't be taken against our plaintiff. That's pretty weird, though. In my opinion, I don't think it's weird at all. I think you have a land developer who has a great plot of land and has contracted with various other people to sell the land. They say, I want this dollar amount. How much you get above that is your business. Then this person does the transaction. He doesn't hold the land. He buys it, sells it, and gets a quick turnaround. I don't think that's a very unusual business deal. In fact, it's probably a very savvy business deal. Again, let's assume the plaintiff in this case provided an affidavit by two parties. One was the actual, let's call him the middleman in this land transaction. He said he had no connection with the entity or even our plaintiff in this case. He said he bought it. He sold it. That's it. The agency is entitled to disregard that or find it not credible in the absence of some corroboration, independent corroboration, like an appraisal, more information about the principles in each of these entities that were involved in the transactions on the same day. It's a sworn affidavit by an independent party that has no affiliation to the parties involved. The agency is entitled to insist on corroboration in order to determine the veracity of the affidavit's assertions. If the agency was concerned about that, the agency would have said, Clearly the agency was concerned. Ask for more information. They asked for information, but they did not ask for an appraisal of the property. They asked for everything surrounding the sale of the property, and that was provided. An affidavit from them, an affidavit from the owner of EMC, in essence, the parent agency. It's very clear that the legitimacy of this project was the focus of the agency's concern, that this was a sham and an abuse of the EB-5 visa program, and that should have prompted a very thorough response, and the agency didn't get it. But the agency's asking us to prove something that, prove a negative. The transaction, we have the affidavit by the seller of the land, the middleman, as we shall call him, saying, I am not affiliated with them, I have no connection with them. So now, what is the agency requiring us to do? To go back and get all land deals with that agent before, and all the prior land deals that occurred before then? It's an impossibility that we can never meet. I would venture no party can ever meet that possibility. If someone goes to buy a house, and in that house, we have to prove who were the prior owners, and how much they sold it, how much it was worth, and so forth, you can never have a sale of a property. At best, this is a speculation by the government that something was fishy about it. But I would again venture, even the question is not appropriate. You bought a piece of land, and you value that piece of land at a certain dollar amount. The fact that someone made money off that transaction doesn't mean that it's any kind of a fishy deal. Were there improvements made on this land? Improvements were made, to my understanding. I don't want to mix it up with the other one, but is this the one where they supposedly put in a sewer system? Sewer system, some foundations were poured, and so forth. And had to do some clearing of stuff? Correct. And what's there now? Best I can tell, it's a big mess. My understanding is, and I tried to confirm this yesterday, is that the property is still under development. They have reached an agreement with the city of Elgin to continue in the program, and it's still underway with regard to that. But again, the EB-5, all that that requires is you can put the money at risk, sit on it for two years, basically, and that is prospective of creating a job. There's absolutely no requirement that the actual facility be built or completed on any certain time frames, that the job creation is the issue. But again, the government is focusing on this land deal. I mean, if someone buys a Picasso and they value it at a certain dollar amount, the oil on the canvas of the Picasso is not worth the millions of dollars you pay for it. It's what you value it. The fact that this person, the middleman, has this deal, we don't know what to transact. What if the original seller wasn't under duress, had a family emergency? The original seller owned 19 acres of land. Maybe he had to quickly unload it because he wanted to invest somewhere else. So there's nothing there. The government just can't say, we think it's fishy, period. The plaintiff responded with everything they requested, and there's eight points they requested. The plaintiff responded to each and every one of those points. Then the government comes out from nowhere and says, well, you should have gave us an appraisal. Well, tell us you want an appraisal, and we'll get an appraisal. My understanding, an appraisal was actually made, and it was valued at over $1,200,000, which is more, not a current appraisal, a backdated appraisal, looking at the property at that date, and it was worth $1.2 million, which is more than what's paid for this property. But you can't just say, always push the goalposts further, further, further. You are telling us, this is the eight points you want. We have responded to the eight points you wanted. Now, oh, you should have gone for this. This is, again, where there's a belief or understanding that maybe these things were all predestined. Maybe these decisions were predestined, and we're just going to justify our decisions in these cases somehow. But there's nothing here. We believe the decision was arbitrary and capricious. We have the right to review. We have a right to have this decision overturned. There's nothing to support what the government is requesting of us. There's nothing to say that even questioning the land transaction shows there's a bias in this particular case. What did the district court say in all of this? The district court agreed with the government in essence in saying that the land transaction and all the other aspects of the case was in line with what the government decision is. And you're saying that's arbitrary and capricious. It is. I mean, you were asking for a land transaction. Again, it's irrelevant what transpired. It's irrelevant if you bought land at a higher price. There's nothing to show that. But coming back down to it, the plaintiff in this case put $500,000 at risk. Let's assume EMC, the parent company, was shady somehow. He put his money at risk, even with a shady company or not a shady company. He put it. He met all the standards by prominent evidence that he is entitled to removal of the conditional residence. That's all that we're asking, that his conditional residence be removed. He'd get a permanent green card. You represent only this one and not the other 23. I don't represent the other. If there's nothing further. Thank you. Mr. Press. Thank you, Your Honor. This is Joshua Press from the Department of Justice here on behalf of the defendant. Your Honor, this case, the EB-5 program, is about much more than just throwing $500,000 at a company and saying, therefore, I'm entitled to a green card and a path to citizenship. It's about creating legitimate investments that will create U.S. jobs for U.S. workers. And nowhere in the argument that we just heard was there any focus on job creation in U.S. workers, which is the entire point behind the program. It's why the program was created. It's why a path to citizenship is being created for essentially wealthy individuals from around the world. To say that this is just about a shady land deal misses the entire point of the program. If it were just as simple as throwing money into an account  I'm entitled to a path to citizenship, I guess that Mr. Doe would be entitled to get his I-829 approved. It's not nearly that simple because a path to citizenship is extremely valuable in this world and certainly to being a citizen in this country. It's also important to note that there were two bases for denial. Not just the land deal was not a legitimate transaction where capital was placed at risk, but also that they did not show that there would be sufficient job creation. I think the reason that wasn't focused on in the previous argument is because to answer your question, Judge Mannion, the development of the site was supposed to begin in 2011. It was actually supposed to be operational in 2011. And nothing has been done. The project has not gotten off the ground, literally. I think a sewage pump has been constructed and some concrete poured. That's not the creation of the Elgin Memory Care Center. That's not the creation of U.S. jobs. Everything that was submitted to the agency in 2010 and 2011 about how this would create at least 10 U.S. jobs, none of that materialized. It was that concern that led the agency to giving the project more time. When they actually issued an RFE, they focused on that concern and how, look, this transaction, given that nothing has occurred in three years on this development site for practically nothing, we are very concerned about the flipping nature of the land deal transaction. And by the way, if nothing is occurring to actually develop the Elgin Memory Care Center, then how are you ever going to create 10 U.S. jobs?  and they've still not been able to create a sufficient number of jobs for the purposes of this program. Are these two projects related? Different people? There is that allegation in terms of different people between the businesses of UIS, the E-A-L-E-F, the fund, where monies would be pooled together from EB-5 proposed investors, and the Elgin Memory Care Center itself, It seems to be coincidental that they're both for the same type of project. Well, I'm not sure about that. That's Fox Lake. Well, so there are similar projects across the country that are structured in a similar way. Yes, but that doesn't mean that the focus by the agency on this case for the transaction that occurred here is in any way wrong. They try to trace the funds and how those funds will get used and whether or if ever those funds will actually be used to create U.S. jobs because they don't want this to be a money laundering program. The agency decisions, I think the decision in this case discussed a matter of Izumi, a matter of Ho, to a greater extent. Those came about because of a concern that the EB-5 program was being abused and manipulated to become a money laundering program and a creation of a green card mill. Well, this money laundering phrase, whatever you want to call it, money laundering, is it where rich people can buy their way into a citizenship? Yes, but not only that. They're trying to use funds that they will eventually get a return on later on through this program because this money is coming from out of the United States and it's not always clear that money coming from out of the United States is legitimate. The agency requires pretty stringent tracing of where those monies are coming from and how those monies are actually getting to U.S. jobs or the creation of U.S. jobs for U.S. workers. That was the entire point behind the program, but the legitimacy of every step along the way in that tracing is crucial for the program to not be abused. So this is all for 10 jobs? It's supposed to be, and we never have gotten there under any real methodology that has not occurred. I think what the other side has been saying with that is we'll get to 10 jobs eventually and what USCIS is focused on is when is that going to occur? Please let us know when that will occur. You have to build a nursing home or whatever it's going to be. Right, I mean if you're not going to actually build the business literally not going to build the building, it's difficult for the agency to credit the methodologies however complex Mr. Doe wants to make them that those workers will actually get those jobs. And I think in the briefing there was some dispute about this is moving the goalposts and I think we heard echoes of that in the argument just now. This is not about moving the goalposts, it's about when an I-526 gets approved, there's a lot of hope and there's usually a lot of paperwork involved with that and a lot of planning that's presented to the agency. But when none of those plans materialize, that is itself a material change in circumstances. And I think the change in circumstances here was that, okay you've got a job site and you've got a construction site, but no construction's occurring. We don't know why that is, but that is in itself very alarming to the agency. So we'll go back to the job methodology that was presented in the earlier years ago I-526 plan and they'll take a look at that and if those conditions and assumptions that were built into the plan never actually check out, then the agency will start getting concerned and ask for a new methodology. On that independent basis, that's what occurred here and I think that is fully rational, far from being arbitrary and capricious. Does anybody get their money back? Sometimes in this one. I'm not sure. I actually have not been following the other investors in this. This has been sort of a rather sorted investment project. But I've been focusing really on just Mr. Doe's case. Are you aware that there are other cases pending involving all of these developments that seem to have the same principle? I'm not aware of any other USCIS cases. I try to limit my universe to USCIS denials. So you don't know of any other investor immigrants that have brought judicial review cases stemming from Taylor Camelli's activities? No, not right now. And he's the elephant in the room here. Yes, and that's undeniable based on this panel's previous opinion related to this case. And the reason I don't know is simply because I don't really ask my colleagues if there are lawyers who don't communicate with SEC lawyers on the same subject matter. Actually, you'd be surprised at how rare that is. It takes quite a lot of agency coordination, thankfully for the government to bring down the hammer or try to bring down the hammer on anybody. In that respect, I am aware that USCIS has had concerns about the Memory Care Center project for many years, mainly because there were a lot of people who were interested in that, and yet nothing has ever occurred in that project. Or nothing material has ever really occurred with that development and the promises that were made back in 2011. Well, you may not know, but I assume somewhere there's a successful end to one of these projects. Well, there could have been. Far removed from that. You're far away from it, and I know it goes to policy and everything else, but this just makes no sense, other than to get some rich people to put a lot of money. Right, and that's sort of the complete opposite of what the program was supposed to be for. As you can imagine, this is a controversial program. Politically, there were a lot of compromises that came into the existence of this program. The program is controversial. Yes, but it's controversial simply because on one side of the aisle, people want to encourage investments that would create jobs in this country, and that is incredibly important politically. On the other side of the aisle, we don't want just wealthy people coming in and saying, I'm entitled to a path to citizenship because I'm wealthy. That dilutes the value of the citizenship to every citizen in this country. And so those are the concerns that went into the program. If you have a program that simply allows for a path to citizenship because someone is wealthy, and they don't have to do anything else besides prove that they deposited $500,000 in an account, that is an abuse of the entire process. It undermines the entire reason why the process and program was created, and it dilutes the value of the green cards that people are being given to this program. If there are no further questions, we ask that the District Court's opinion be affirmed. Thank you. Mr. Kola. Just briefly again, there is nothing involving money laundering in this case because that's already been screened out by the government when they initially approved the applications. With regard to the EB-5 visas, this is how the EB-5 program works. People pool their money together and they get $500,000. A famous real estate developer that goes to China gets 200 Chinese citizens, they invest $1 million and he builds this building. And now that building is in existence. That's how the program works. That's how the government set up the program. You invest $1 million or you invest $500,000 in certain areas, you get your green card. They can't now say, well, we don't like that. If they don't like it, get rid of the law. You cited one that you said works. There's several that works. That's how all these projects are. You said a bunch of rich people from China threw their money together and there's a successful project somewhere. Correct. We can talk to our President about how his project got off the ground. He works off EB-5 programs all the time. Our President of the United States, Donald Trump, he uses EB-5 programs to get investment into his buildings. It's, in essence, free money. People are willing to pay a million dollars to get a green card. Most of those people, my understanding is, don't care if they lose that million as long as the money goes to where it's going to go. There's no scam involved. Things are being done. Things are being built. There are certain entities that focus on building retirement communities. Certain entities are on amusement parks. Certain entities are on buildings. That's just how the program works. We can't say he should be denied because we don't like the program itself. If we don't like the program, then get rid of the program. You can't say he did something nefarious in this particular case. With regard to job creation, the documents provided to the government by canceled checks and so forth show that $2.13 million was invested in this case. The government did not take that. They created this whole number of $735,000 as far as money expenditures, and that's where they came up with their nine jobs created as opposed to ten jobs created. Again, there's no requirement that the actual building be completed or the project be completed. We just have to be working towards that goal and that ten jobs will eventually be created. We've met our burden which is of a pound and a cent. Thank you. Thank you. Our thanks to all counsel the case has taken under advisement.